UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

JOSEPH CORNELIUS YOUNG, III, ET AL.       CIVIL ACTION

VERSUS       NO. 20-2165

RHONDA LEDET, ET AL.       SECTION "J"(2)

## REPORT AND RECOMMENDATION

Before the Court are plaintiffs Joseph Cornelius Young, III, John Fitzgerald Bonvillain, Jr., Barry Dominique, and Tory Mitchell's Motion for Preliminary Injunction (ECF No. 29) and defendant Gordon Dove's Motions to Dismiss (ECF Nos. 134, 242) seeking dismissal of the claims brought by plaintiffs Joseph Cornelius Young, III and Barry Dominique.  The motions and underlying matter were referred to a United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), including statutory frivolousness review under 28 U.S.C. § 1915, and § 1915A, and as applicable, 42 U.S.C. § 1997e(c)(1) and (2).[1]  Upon review of the record, I have determined that these matters can be resolved without further hearings.

## I.    BACKGROUND

Forty-one pretrial detainees housed in the Terrebonne Parish Criminal Justice Complex ("TPCJC") filed this *pro se* suit under 42 U.S.C. § 1983 against defendants Warden Rhonda Ledet, former Warden Stephen Bergeron, Terrebonne Parish President Gordon Dove, and Captain Mitch Dupre.[2]  ECF Nos. 4, 4-1.  The claims of four plaintiffs, Joseph Cornelius Young, III, John

---

[1] *See also* Local Rule 73.2(A); ECF No. 31 (referral for Motion for Preliminary Injunction).

[2] A fifth defendant was identified as Chief "Seth" Bergeron, but summons was returned as unexecuted with the notation, "no su[c]h person!"  ECF No. 58, at 1.  Plaintiffs Young later testified that he was unsure of the Warden's first name and included both "Stephen" and "Seth" Bergeron.   Warden Stephen Bergeron is already a defendant, and plaintiffs have no claims against a Seth Bergeron.

Fitzgerald Bonvillain, Jr., Barry Dominique, and Tory Mitchell, are before this Court.[3]   Each of

these plaintiffs is proceeding *in forma pauperis*.   ECF No. 14, 17, 18, 97.

### A.    Factual Allegations

### 1.   The Complaint (ECF Nos. 4, 4-1)

Plaintiffs allege that defendants, officials affiliated with the TPCJC, have endangered the

inmates by failing to implement policies or provide personal protection equipment ("PPE") and

other cleaning and sanitizing tools to help prevent the spread of COVID-19 virus within the jail.

Specifically, plaintiffs claim they are not provided cleaning chemicals, paper towels, disinfectant,

hand sanitizer, or masks.   They further claim that jail officials are in violation of local, state, and

federal restrictions and guidelines recommended by the Center for Disease Control ("CDC") and

the World Health Organization ("WHO").

Plaintiffs assert that the prison has not adjusted its policies, practices, or customs to comply

with CDC- and WHO-mandated guidelines to prevent the contraction and spread of the COVID-

19 virus within the prison.   Plaintiffs allege that jail officials are not using a 14-day quarantine

period or daily assessments of incoming or infected inmates to assure these inmates remain

separate from other non-exposed inmates.   Plaintiffs also claim that the jail has no daily

temperature checks, monitoring of symptoms, or testing for the virus.   They complain that jail

officials do not regularly monitor inmates' temperatures and test for the virus, for both inmates

---

[3] I denied pauper applications for two plaintiffs and neither paid the filing fee to proceed as a plaintiff in this case. ECF Nos. 30, 206.   The claims of 31 other plaintiffs have been dismissed by the court for failure to prosecute.   ECF Nos. 150, 152, 159, 161, 163, 165, 167, 169, 171, 173, 175, 182, 184, 186, 188, 190, 192, 208, 210, 212, 214, 216, 218, 220, 222, 224, 226, 228, 230, 232, 234.   I have issued Findings and Recommendations to dismiss four other plaintiff's claims for failure to prosecute.   *See* ECF Nos. 266-69.

within the jail and those entering the jail.   Plaintiffs also claim that, although the nurse checked

their temperatures upon their arrival at the jail, they have not had a temperature check since then.

Plaintiffs also acknowledge that they are given garbage bags and floor mops daily during

the week, but not on weekends.   As a result, on weekends, they allege exposure to dirt, filth, dust,

urine, black mold, vermin, pests, unclean toilets, un-scrubbed showers, and un-sanitized surfaces.

Plaintiffs seek declaratory and injunctive relief under state and federal laws, as well as

compensation for the continued violation of their civil rights, mental anguish caused by the lack

of protection from COVID-19, and pain and suffering as a result of the TPCJC administration's

lack of empathy for plaintiffs and their families during the pandemic.   ECF No. 4, at 6 & 13.

### 2.  Reply to Response Order (ECF Nos. 86, 113)

In reply to my § 1983 response order, plaintiffs each indicate that they were not tested for

the virus after two hurricane evacuations in September 2020.   Plaintiffs asserted that, on

September 30, 2020, the DOC required TPCJC officials to test inmates who had been temporarily

transferred to Allen Correctional Center during Hurricane Sally.   The reason for the testing was

not told to the inmates.   Plaintiffs claim no other testing was done by TPCJC.

Plaintiffs also added their concern that Trustee inmates with responsibilities such as food

service are not properly screened to be "absolutely disease free" before allowing them to prepare,

cook, and serve food.   In addition, plaintiffs complained that cleaning and sanitizing is regularly

done in staff areas but not inmates' living areas.

### 3.  Young's Amended Complaint (ECF No. 244)

I granted plaintiff Young leave to amend the complaint to add a supplemental claim against

"Mr. Billiot" for retaliation in response to plaintiff's exercise of his constitutional right to access

to the courts.   ECF Nos. 114, 244.   Specifically, Young alleges that, on October 6, 2020, TPCJC employee Billiott ("Mr. Billiot") physically assaulted him and stated, "I am going to destroy you Mr. Lawsuit Man."   ECF No. 244 at 1, ¶ I.   He further alleges that, on October 12, 2020, he was physically assaulted by the Terrebonne Parish "strike force" when he banged on the pod door to get the attention of a deputy.   *Id.* at 1, ¶ II.   He also alleges that, by October 15, 2020, he had been housed for three days in a cell with no running water and forced to drink from a toilet and had not showered for eight days because of the hurricane evacuation.   *Id.* at 2, ¶ III.   Young also contends that he has been "targeted" by the administration at TPCJC because the defendants know he is spearheading the filing of the papers with the court.   *Id.* at 2, ¶ IV.   He also alleges that he "requested to speak with Internal Affairs about [his] concerns for the type of retaliation that [he is] receiving," but the matter was not addressed.   *Id.* at 3, ¶ VIII.

### 4.  *Spears* Hearing Testimony

On November 30, 2020, I conducted separate telephone conferences with these four plaintiffs, Young, Bonvillain, Dominique, and Mitchell.   ECF No. 196.   Participating via telephone in each conference were the individual plaintiffs and counsel for the defendants.   *Id.* Each plaintiff was sworn and testified for all purposes permitted by *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), *overruled on other grounds by Neitzke v. Williams*, 490 U.S. 319 (1989), and its progeny.   The conferences were electronically recorded.

### a.    Testimony of Plaintiff Young

Joseph Cornelius Young, III, testified that he filed this suit because the officials at the TPCJC failed to implement and enforce a policy for the COVID-19 virus pandemic.   He does not allege that they had a policy intended to cause him harm, but that the officials simply lacked a

policy to protect inmates from the virus.   He confirmed that he is treated no differently than other inmates with respect to COVID-19 policies or treatment.

He testified that the officials did not have a quarantine area for inmates arriving at the jail when he arrived in June 2020.   He stated that when he arrived, a nurse checked his temperature in the portico and he told the nurse that he may have been exposed to the virus.   Nevertheless, about 30 minutes later he was placed in general population in an overcrowded area.   The nurse also told him that the jail no longer performed tuberculosis tests for incoming inmates.   Young stated that this concerned him because Trustee inmates work in food service without being screened for illnesses.

Young also stated that he was not sure if ever had the virus, because the inmates had no temperature checks or testing.   He stated that, at some point after his arrival, he had a cough with "green stuff," stuffiness, and shortness of breath.   The nurse gave him antibiotics, but he never saw a doctor.   He received antibiotics several times in response to his complaints of coughing up "green stuff."   He has not sought any other medical treatment.

Young also stated that TPCJC officials do not comply with what he described as CDC and WHO regulations.   Young claimed that jail officials have no transparency and do not provide inmates with information needed to keep themselves safe.   Specifically, he testified that inmates are not quarantined, provided with hand-sanitizer and disinfectant, or given regular temperature checks.   Young also testified that each inmate is given one bar of soap per week which is not enough to use for bathing, handwashing, and cleaning surfaces not otherwise cleaned by the jail personnel.   Because soap is not in the indigent kit, he has asked for extra soap about four times,

but his requests were refused.   Young was unable to identify the deputies he asked for soap, but described them only as young, white males.

Young testified that inmates receive garbage bags and a mop and bucket, but he does not believe the water in the bucket contains cleaning solution.   He testified that the inmates do not get these items on holidays or weekends.   Also, inmates must use their own soap and rags to clean their living area.   Inmates are not given gloves, so he has had to clean the urine trough with his hands.

Young also complained that the prison is overcrowded, leaving no ability to socially distance.   Young believed that there was a virus outbreak in the jail at the time of the *Spears* hearing, because he noticed that guards were doing the work normally done by Trustee-inmates.

As for his retaliation claim, Young explained that, because of a hurricane threat, inmates were evacuated from TPCJC to another prison, which he anticipated could be a long ride. Because he is diabetic, he decided to put a piece of candy in his mouth.   He showed the two pieces of candy to Mr. Billiott, who told Young to either eat it or throw it on the ground.   Young claimed that one piece fell, so he bent down to pick it up to eat it.   He alleged that Mr. Billiot slapped the candy out of his hand, and said "I'm going to destroy you Mr. Lawsuit man."   When Young returned to TPCJC after the hurricane evacuation, Mr. Billiott had officers lock Young in "the hole" for disobedience.

Later, because he was in the hole, Young decided to ask for his diabetes medicine.   The dormitory had no call button, so he repeatedly beat on the door to get someone's attention.   The strike force entered the tier and held him down, causing injury to his shoulder and side.   Young claims that he now suffers seizures in his head and the back of his eye.   He also claims that he

6

refuses to seek medical care from the people who caused his problems.   He has decided instead to seek medical attention when he is released from prison.

Young stated that the task force had no knowledge of this lawsuit, and the incident was unrelated to the incident with Mr. Billiot.   He also stated that no one at the jail has prevented him from filing administrative grievance complaints or any documents with a court and no one has tampered with his legal mail.   He also is able to access the jail's law library. Young testified that he filed grievance complaint forms after each incident related to virus protocol.   He stated that his requests were denied at each step, and he proceeded through every appeal level.   The responses indicated that the facility was in compliance with protocol for Department of Corrections adult inmates.   Young complained that officers at each step would just agree with the last responder.

Defendant Ledet is now the Warden, and Young sued her in that role over the facility.   He also named Warden Ledet because, at the time suit was filed, she was in the line of review for the grievances and would just concur with the Lt. Shwarzer, the first step responder.   He testified that he asked to speak to internal affairs about COVID-19 protocol in the jail, but instead he was allowed to speak to Warden Ledet for 45 minutes about his concerns.   He also spoke to her on another occasion after the strike force removed him from his cell for banging on the door.   Young stated that he also provided Warden Ledet with a copy of the complaint before he filed this lawsuit to provide jail officials a chance to correct the problems.   She did not do anything in response.

Young testified that he named Stephen Bergeron as a defendant because he was the Warden before Warden Ledet.   At the time, Bergeron was the last person to review his grievance complaints on appeal, and simply concurred that the prison was complying with procedures. Young also clarified that he, at times, erroneously identified Warden Bergeron as "Seth Bergeron"

in the complaint but they are one in the same person.   Young stated that he named Warden
Bergeron as a defendant because of his position as warden for failing to pay attention to the needs
of the inmates and never adjusting for the pandemic.

Young testified that he named Terrebonne Parish President Gordon Dove as a defendant
because he is president of Terrebonne Parish Consolidated Government ("TPCG") and "financier"
of the jail.   Young believes the facility was in default and Dove bailed the facility out.   Young
claims that Dove is connected to the building because it is owned by the TPCG.   He also claims
that TPCG runs the nursing department at the prison.   Young indicated that he has never spoken
with President Dove.   He included President Dove as a defendant because he and the parish
government "forgot" about the inmates when it came to safeguarding parish run departments.
Young is unaware of any prison-related policies adopted by President Dove or the TPCG.

Young testified that Captain Mitch Dupre replaced Warden Ledet in the first appeal in the
grievance process.   He sued Captain Dupre in his official capacity based on his position at the
prison.   Young stated that he has spoken to Captain Dupre but not about the issues in this case.
Their conversation, instead, involved Young's request for a telephone call to call the United States
Marshal's Service about service fees in this lawsuit.

**b.   Testimony of Plaintiff Bonvillain**

Bonvillain testified that the inmates at TPCJC are not provided with cleaning supplies.   He
stated that jail officials do the bare minimum to address COVID-19 "to keep the cameras fooled."
Bonvillain does not contend that there is a policy or order by a defendant to intentionally expose
him to COVID-19.   He indicated that nothing is being done to punish him, and that all inmates
are treated the same.   Bonvillain claimed instead that the prison should have a quarantine area for

positive cases, regular temperature checks, access to better cleaning supplies, and house healthy inmates separately from virus-positive inmates.   He stated that the Lafourche Parish jail provides regular supplies of wipes and disinfectants, something not done in TPCJC.   He also claimed that jail officials now spray the pod daily, but he does not know what the spray is.   He also complained that the inmates do not get towels to wipe the spray off of their things.

As for cleaning supplies, Bonvillain stated that inmates receive trash bags and a mop and bucket in the morning most every day.   He has asked for more cleaning supplies from the officers who come with the Trustees, but is told that is all they were told to give the inmates.   Bonvillain stated that the mop water has bubbles in it, but he was not sure if it contains a cleaning solution. He stated that inmates are not provided with disinfectants, bleach, or Lysol spray.   He acknowledged that inmates receive soap but it not enough to last the week.   He agreed that inmates have to buy more from the commissary if needed or borrow from other inmates.

Bonvillain recalled that one day, jail officials posted a memo indicating that there were no positive cases in the jail.   He claimed, however, that inmates on his tier were not tested that day. He instead was tested the day after the memo was posted.   He also testified that the CDC and WHO guidelines are violated because inmates are not kept six feet apart and are not always wearing the masks provided by the officials.   At the time of the hearing, Bonvillain was wearing a mask; he stated that not all inmates wear them.   He complained that jail officials do not enforce the wearing of masks and do not punish inmates who do not wear masks.   He also stated that the dorms are also overcrowded so there is no way to stay distanced.

Bonvillain stated that he believes no efforts are made because he does not see jail officials making changes to fight the virus.   He stated that there are two dormitories used to quarantine

inmates across the hall from his dorm.   He stated that some inmates who arrived without the virus and now have it because restrictions and cleaning are not taken seriously.   He indicated that two inmates in his dorm had the virus prior to his arrival but did not appear to be ill.   He checks himself for virus symptoms.

Bonvillain stated that he has not had any physical injuries from the conditions of the prison. He stated that he has only sought medical care for diet and allergy restrictions.   He has filed grievances and requests to see a doctor about his allergic reaction to oatmeal but not the virus.

Bonvillain testified that jail officials responded to his grievance complaint about COVID-19.   The response indicated that the jail was meeting the guidelines.   The appeal decisions just concurred with the first response.

Bonvillain also testified that he sued Warden Ledet because she is responsible for what goes on at the jail, and despite multiple complaints, she did nothing to change the protection of inmates for the virus.   He repeated that the jail has done no testing or temperature checks.   He stated that inmates have been moved to two different prisons for hurricane evacuations without testing.   He also claims that he was with 10 or 15 inmates who tested positive for COVID-19 in the past.   He stated he tried to speak to Warden Ledet but was told he could not speak with her. He explained that he does not what role she had in adopting policies or what she did or did not do in that regard.

He also stated that he sued Warden Bergeron because he ran the jail before Warden Ledet. Bergeron also was in the grievance review chain and did nothing to change what was going on in the jail.   Bonvillain stated that he never spoke with Warden Bergeron directly.   He does not know what Warden Bergeron did or did not do with regard to implementing COVID-19 policies.

As for President Dove, Bonvillain sued him because the TPCG owns the prison building and runs the jail too.   He does not know what role President Dove had as far as jail COVID-19 policies, and he never spoke with President Dove.

As for Captain Dupre, Bonvillain stated that Dupre responded to one of Bonvillain's grievance complaints.   Bonvillain has spoken to Captain Dupre about other issues but not about the COVID-19 or pandemic concerns.   Bonvillain recalled that Dupre may have responded to one of his grievance forms.

   **c.**  **Testimony of Plaintiff Dominique**

Dominique testified that he sued Warden Ledet because she is the warden and was a Captain when the suit was filed.   Although he has never spoken with her, he stated that she is a responder in the grievance procedure.   He indicated that she answered his grievances indirectly and changed nothing.

Dominique indicated that he sued Warden Bergeron because he was the warden until recently.   He sued Bergeron as the warden, not because he was personally involved in a particular violation.   Dominique stated that he never spoke to Warden Bergeron about COVID-19.   He also sued President Dove because he is the president of the local government.   He sued Captain Dupre because of his position at the prison.

Dominique stated that he filed suit because the prison does not check temperatures and places inmates off the street in the same dormitories as other inmates.   He indicated that he does not know what protocol is used to check incoming inmates.   He also stated that he has never had his temperature checked but he was tested for the virus once in October.   He stated that the guards have masks but they do not all wear them properly even when they mix with inmates.   He also

stated that about two or three months after his arrival at the jail, he was provided a mask.   At some point, he left it on an evacuation bus and received a replacement mask about eight days later.

He stated that on weekdays, inmates receive brooms, mops, and garbage bags to clean the tier and cells.   On holidays and weekends, they do not have access to a broom or mop.   Inmates also receive one bar of soap and have to buy or borrow if more is needed.   He stated that he receives one bar of soap per week but it only lasts about three days.   He is not provided with more even though he is an indigent.   He has asked Deputies Billiott, Theriot, and Stigel for more, but he has been denied.   If he needs more soap, he borrows from other inmates.

He also stated that inmates can use this soap and their face towels to wipe things down, but it is the only soap and bathing towel they get per week. Dominique also stated that the hatch hole is not cleaned often enough despite the fact that it is used to pass everything through it to the inmates.   He stated that he can see from his cell that the hatch hole is not cleaned during the day, but he cannot be sure if it is cleaned at night while he sleeps.   He also clarified that the hatch hole is cleaned on Wednesdays and Saturdays when laundry is passed through it.

Dominique also stated that he does not know the virus protocol for Trustee inmates.   He only indicated his dissatisfaction with their food service equipment.

Dominique testified that he has never been positive for COVID-19 and has only been treated for a hernia for which he had surgery.   He has not suffered any physical injuries as a result of the COVID-19 protocols at the prison.   He also indicated that jail officials have begun to spray the dorms with disinfectant once or twice but he does not believe they clean the phones and kiosks. Inmates are removed during spraying so he is not sure what cleaning is done.

Dominique testified that he filed grievances and he received responses, but did not appeal the results.   He did not believe appealing would help get anything done.   He also acknowledged that two or three inmates in another dorm who tested positive and those inmates are quarantined. After they got over it, those inmates were placed in his dormitory.   The quarantine dormitory is in the same pod but across the hall from his dormitory.   He has never been housed in the same dorm as a person positive with COVID-19.

### d.    Testimony of Plaintiff Mitchell

Mitchell stated that he sued Warden Ledet, because she runs the jail and he could not speak to her about matters in the prison.   He stated, however, he met her on the morning of the *Spears* hearing, after officials responded to a disturbance in the quarantine pod across from his dormitory. He stated that she was sued because inmates filed grievances and requests for aid and Warden Ledet did not respond.

He sued Warden Bergeron because he told inmates that he contracted the virus in August 2020 while on vacation.   Mitchell believes that Bergeron made the jail unsafe when he returned to work a week after having the virus and spread it within the jail.   Mitchell also claims that Warden Bergeron did not follow pandemic procedures or respond to the inmates requests for help.

Mitchell testified that he did not know Gordon Dove or why he was sued as a defendant in this case.   He has not spoken with Dove nor does he know his connection with this suit.

Mitchell stated that Captain Dupre was the officer who escorted him to the *Spears* hearing but he was not sure why he was named in the suit.   He stated that Captain Dupre previously headed sanitation at the jail and may have personal vendettas against people in the jail.   He believed Dupre may have been sued for his role as head of sanitation and not that he personally did anything.

Mitchell also stated that he believes the prison has failed to adopt policies and procedures to address COVID-19.   He denied that any defendant had a policy or issued an order that intentionally exposed him to the virus, although he does not believe the officials did enough to prevent the virus spread.   He believes the officials should have separated the inmate population.

Mitchell testified that he tested positive for the virus in August or September although he had been in the facility since June 8, 2020.   He acknowledged that he had his temperature checked in June 2020 when he arrived at the facility.   He was placed in a dorm with people previously had COVID-19.   He has remained in the same dormitory since he arrived.   After he tested positive, the officials began to improve how they handled the complaints.   While ill, he recalled having minor headaches, neck pain, and loss of appetite.   He also claimed to have had a fever of "115" degrees, although it was only checked once when he was tested.   He did not have his fever checked any other time after his arrival in June.   He was not sure if he recovered because he was never tested again.   He no longer has a loss of appetite and only gets a normal amounts of headaches.

Mitchell stated that he has not sought medical attention at any other time because he has to pay for medicine and pay $5 to talk to the nurse.   He only saw the nurse when he got his temperature checked on arrival in June.   He did not indicate who he saw when he was tested and found positive for COVID-19.

Mitchell acknowledged that the officials have slowly improved protocol in the jail.   The officials spray the dorms once a week with Lysol or Favaloso.   The inmates eventually received masks in July or August.   He also stated that guards did not wear their masks when he first arrived but now take it more seriously.   The officials created quarantine dorms and, about one month

before the *Spears* hearing, started putting incoming inmates off the street into a separate quarantine dorm.

Mitchell also stated that inmates have to use their commissary soap to clean around the dormitory.   He stated that he uses the soap they give him to wash his clothes, and he buys soap to bathe.   The inmates also are given a mop and bucket every two days, but the bucket seems to just be filled with water.

He also asserted that he filed grievance complaints and received responses after seven to ten days.   He did not appeal because he did not know how to appeal.   Instead, he continued to file new grievance complaints and worded his complaints differently each time.

B.    **Pending Motions**

1.   **Plaintiffs' Motion for Preliminary Injunction (ECF No. 29)**

Plaintiffs have moved for a preliminary injunction seeking emergency relief to address the conditions at the TPCJC during the COVID-19 pandemic.   Plaintiffs seeks an order directed to defendants to accomplish the following:

1.   prohibit "defendants from housing too many detainees in a manner that violate[s] Title 22 of the Louisiana Constitution and fails to maintain social distancing as defined by the interim guidelines published by the Center for Disease Control (C.D.C.);"

2.   prohibit "defendants from permitting any inmate demonstrating any symptom[m] of COVID-19, including fatigue, fever, abnormal breathing, dry cough, etc. to remain in population with other inmates;"

3.   "require defendants to offer testing for COVID-19 as requested, required, and needed;"

4.   "required defendants to check detainees temperature daily for the first fourteen (14) days and at least twice (2) a week after quarantine is completed in phase on (1) of reopening from mandatory lockdown; once (1) a week in phase two (2); and once (1) a week in phase (3);"

5. "require defendants to quarantine detainee[s] properly by not placing new intakes in dorms with detainee[s] who have been cleared by medical as being COVID-19 free;"

6. "require defendants to provide detainee[s] with 'all the necessary' cleaning supplies, chemicals, personal protection equipment (P.P.E.), paper towels, disinfectants, and hand sanitizers throughout the day to ensure safe sanitary practices for all individuals and often touched areas;"

7. "require defendants to file reports, every forty[-]eight (48) hours indicating the number of detainee[s] or staff who have contracted or who are suspected of contracting COVID-19, the number of persons in quarantine, and the defendant's compliance or non-compliance with the court order;" and

8. "any other relief the court deems to be approp[r]iate and necessary."

ECF No. 29, at 2-4.

Plaintiffs argue that these measures are necessary because TPCJC has the highest rate of positive cases within the Parish and the surrounding Parishes of Lafourche, Assumption, and St. Mary combined. *Id*. at 4. Plaintiffs contend this high rate of Covid-19 is the result of the negligence of the administration at TPCJC. *Id*. Plaintiffs allege a "systemic culture" at the prison of neglect and "blat[a]nt disregard" for the prisoners. *Id*. Plaintiffs also point to alleged newscasts indicating a high rate of COVID-19 cases in Louisiana and the CDC recommends that correctional facilities implement "intensified cleaning and disinfecting procedures, reinforcing healthy hygiene practices, encouraging good hand hygiene, and providing detainees with soap, hand drying machines or disposable paper towels." *Id*.

## B.     Defendant Dove's Motions to Dismiss (ECF Nos. 134, 242)

Defendant Gordon Dove filed identical motions to dismiss with prejudice the claims asserted by plaintiffs Joseph Cornelius Young, III, and Barry Dominique pursuant to FED. R. CIV. P. 12(b)(6). ECF Nos. 134, 242. Dove asserts that the claims of Young and Dominique are

"conclusory, nonspecific, and legally insufficient," and provide no basis for a § 1983 claim or specific allegation against him in his official or individual capacity.   ECF Nos. 134-1 at 2, 242-1 at 2.   Dove further argues that plaintiffs failed to assert allegations of intentional indifference and that he is entitled to qualified immunity for his reasonable actions.

Dominique has not filed an opposition to Dove's second motion seeking dismissal of Dominique's claims.   Plaintiff Young opposes Dove's first motion seeking dismissal of his claims asserting that pro se inmates are not required to provide detailed allegations against defendants. ECF No. 194.   Plaintiff further alleges that Dove is the President of the TPCG, which owns the prison building and "completely controls all aspects of the medical department. . ."   *Id.* at 3. Young contends that Dove failed to authorize the prison medical unit "to begin quarantine protocol, daily temperature checks, testing, and aggressive medical screenings" which allowed the COVID-19 virus, "a medical issue," to spread through the jail.   *Id* at 4, 8.   He argues that Dove and other officials were "blat[a]ntly negligent" in failing to include protections for the inmates in the protocol plans.   *Id.* at 5.   He claims this amounted to deliberate indifference in light of the substantial risk to the inmates.   *Id.* at 6

## II.   <u>LEGAL STANDARDS</u>

### A.  <u>Statutorily Required Screening</u>

As soon as practicable after docketing, the court must review a prisoner's § 1983 complaint for a cognizable claim, or dismiss the complaint if it is frivolous and/or fails to state a claim.[4]   A prisoner's *in forma* pauperis complaint that fails to state a claim may be dismissed *sua sponte* at

---

[4] 28 U.S.C. § 1915A; 28 U.S.C. § 1915(e)(2)(B); *Martin v. Scott*, 156 F.3d 578, 579–80 (5th Cir. 1998).

any time if the court determines that the complaint is frivolous or malicious.[5]    A claim is frivolous if it "lacks an arguable basis in law or fact."[6]    A claim lacks an arguable basis in law if it is "based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist."[7]    A factually frivolous claim alleges only facts that are "'clearly baseless,' . . . are 'fanciful,' 'fantastic,' and 'delusional' . . .   [or] rise to the level of the irrational or wholly incredible . . . ."[8]    A court may not dismiss a claim simply because the facts are "unlikely."[9]

A complaint fails to state a claim on which relief may be granted when the factual allegations do not rise above a speculative level, with the assumption that all factual allegations in the complaint are true, even if doubtful.[10]   In comparing a dismissal for failure to state a claim under 28 U.S.C. § 1915(e) and Fed. R. Civ. P. 12(b)(6), *Neitzke v. Williams*, 490 U.S. 319 (1989), held that a claim which is dismissed under one rule does not "invariably run afoul" of the other.[11] If an *in forma pauperis* complaint lacks even an arguable basis in law, dismissal is appropriate under both Rule 12(b)(6) and §1915(e).[12]   "[W]hen a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal under

---

[5]  28 U.S.C. § 1915(e)(2)(i)–(ii); 42 U.S.C. § 1997e(c)(1); *Moore v. McDonald*, 30 F.3d 616, 620 (5th Cir. 1994).

[6]  *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998); *Reeves v. Collins*, 27 F.3d 174, 176 (5th Cir. 1994).   The law "accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless."   *Macias v. Raul A.*, 23 F.3d 94, 97 (5th Cir. 1994) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)).

[7]  *Davis*, 157 F.3d at 1005 (quoting *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997)).

[8]  *Moore v. Mabus*, 976 F.2d 268, 270 (5th Cir. 1992) (citation omitted).

[9]  *Id.*

[10]  *Garrett v. Thaler*, 560 F. App'x 375, 377 (5th Cir. 2014) (per curiam) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[11]  *Moore*, 976 F. 2d at 269 (quoting *Neitzke*, 490 U.S. at 326) (citing 28 U.S.C. § 1915(d) (current version at 28 U.S.C. § 1915(e))).

[12]  *Id.*

Rule 12(b)(6) is appropriate; however, dismissal under [§ 1915(e)'s] frivolousness standard is not."[13]

## B.  The *Spears* Hearing

The initial screening of a *pro se* prisoner's claim includes a review of the complaint and testimony from a *Spears* hearing.[14]   The purpose of a *Spears* hearing is to dig beneath the conclusory allegations of a *pro se* complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims.[15]   "[T]he *Spears* procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners."[16]   The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Rule 12(e).[17]   "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists."[18]

The court may make only limited credibility determinations in a *Spears* hearing, and may consider and rely upon documents as additional evidence, as long as they are properly identified, authentic and reliable.[19]   "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents.   A defendant may not use medical

---

[13] *Id.*
[14] *Spears v. McCotter*, 766 F.2d 179, 180 (5th Cir. 1985) (affirming magistrate court's dismissal of prisoner's claim based on complaint and evidentiary hearing).
[15] *Id.*
[16] *Davis v. Scott*, 157 F.3d 1003, 1005–06 (1998).
[17] *Wilson v. Barrientos*, 926 F.2d 480, 482 (5th Cir. 1991) (citing *Spears*, 766 F.2d at 181–82); *Adams v. Hansen*, 906 F.2d 192, 194 (5th Cir. 1990).
[18] *Spears*, 766 F.2d at 182.
[19] *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997) (citing *Cay v. Estelle*, 789 F.2d 318, 326–27 (5th Cir. 1986), *overruled on other grounds by Denton v. Hernandez*, 504 U.S. 25 (1992); *Wilson*, 926 F.2d at 482).

records to refute a plaintiff's testimony at a *Spears* hearing."[20]   Medical records of sick calls, examinations, diagnoses, and medications may, however, rebut allegations of deliberate indifference.[21]

### C.  <u>Standards for Issuance of a Preliminary Injunction</u>

A preliminary injunction under FED. R. CIV. P. 65(a) "is an extraordinary remedy that is issued only when a party does not have an adequate remedy at law."[22]   The granting of an injunction is the exception, not the rule.[23]   To be eligible for a preliminary injunction, the movant must demonstrate the following:

(1) a substantial likelihood of success on the merits;

(2) a substantial threat of irreparable injury;

(3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and

(4) granting the injunctive relief will not disserve the public interest.[24]

Courts should issue a preliminary injunction only when the movant "clearly carried the burden of persuasion on all four requirements."[25]

In the prison setting, requests for a preliminary injunction are "viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable

---

[20] *Id.* (citing *Wilson*, 926 F.2d at 482; *Williams v. Luna*, 909 F.2d 121, 124 (5th Cir. 1990)).

[21] *Gobert v. Caldwell*, 463 F.3d 339, 347 n.24 (5th Cir. 2006) (quoting *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995) (citing *Bejaran v. Cruz*, 79 F. App'x 73, 74 (5th Cir. 2003))).

[22] *Dennis Melancon, Inc. v. City of New Orleans*, 889 F. Supp. 2d 808, 815 (E.D. La. 2012).

[23] *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

[24] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *United Motorcoach Assoc.'n, Inc. v. City of Austin*, 851 F.3d 489, 492-93 (5th Cir. 2017); *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017).

[25] *Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005) (quoting *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003)) (internal quotation marks omitted).

problems of prison administration.'"[26]   "Except in extreme circumstances," the "federal courts are reluctant to interfere" with matters of prison administration and management of inmates.[27] "Additionally, in accordance with the Prison Litigation Reform Act ('PLRA'), preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the federal right, and be the least intrusive means necessary to correct the harm."[28]

Further, FED. R. CIV. P. 65(c) provides that the issuance of a preliminary injunction shall take place only "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."   However, Fifth Circuit precedent makes clear that in determining the proper amount of security, a court "may elect to require no security at all."[29]

### D.  Standards for FED. R. CIV. P. 12(b)(6) Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a complaint may be dismissed for failure to state a claim upon which relief can be granted.   The Rule 12(b)(6) analysis is generally confined to a review of the complaint and its proper attachments.[30]   The United States Fifth Circuit Court of Appeals has summarized the Supreme Court's standards for Rule 12(b)(6) review as follows:

> "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   A claim for relief is plausible on its face "when the plaintiff pleads factual content that

---

[26] *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (quoting *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982)).

[27] *Young v. Wainwright*, 449 F.2d 338, 339 (5th Cir. 1971) (affirming denial of injunction for inmate to obtain release from administrative segregation).

[28] *Hood v. Vessel*, No. 13-303, 2013 WL 12121562, at *1 (M.D. La. May 14, 2013) (citing 18 U.S.C. § 3626(a)).

[29] *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978) (per curium); *see also Humana, Inc. v. Avram A. Jacobson, MD, PA*, 804 F.2d 1390, 1394 & n.23 (5th Cir. 1986) ("[t]he amount of security required is a matter for the discretion of the trial court"); *EOG Res. Inc. v. Beach*, 54 F. App'x 592 (5th Cir. 2002) ("In this circuit, however, courts have the discretion to issue injunctions without security.")

[30] *Walch v. Adjutant Gen.'s Dep't*, 553 F.3d 289, 293 (5th Cir. 2008).

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   A claim for relief is implausible on its face when "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."[31]

"The   Supreme Court's decisions in *Iqbal* and *Twombly* . . . did not alter the long-standing requirement that when evaluating a motion to dismiss under Rule 12(b)(6), a court must accept[ ] all well-pleaded facts as true and view[ ] those facts in the light most favorable to the plaintiff."[32] Under these standards, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."[33]   Thus, "[w]ith respect to any well-pleaded allegations 'a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'"[34] For purposes of defendant's motions, the court accepts "all well-pleaded facts as true and view[s] those facts in the light most favorable to the plaintiffs."[35]

## III.    LAW AND ANALYSIS

Title 42 U.S.C. § 1983 creates a damages remedy for the violation of a person's federal constitutional or statutory rights by a person acting under color of state law.[36]   "The purpose of § 1983 is to deter state actors from using their badge of authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."[37]   Because

---

[31] *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

[32] *Id.* at 803 n.44 (quoting *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009)); *Murchison Capital Partners, L.P. v. Nuance Commc'ns, Inc.*, 625 F. App'x 617, 618 n.1 (5th Cir. 2015) (citing *Wood v. Moss*, 572 U.S. 744, 755 n.5 (2014)).

[33] *Maloney Gaming Mgt., L.L.C. v. St. Tammany Parish*, 456 F. App'x 336, 340 (5th Cir. 2011) (quotations omitted) (citing *Iqbal*, 556 U.S. at 696; *Elsensohn v. St. Tammany Parish Sheriff's Ofc.*, 530 F.3d 368, 371 (5th Cir. 2008); *In re Katrina Canal Breaches Litigation*, 495 F.3d at 205 n.10).

[34] *Jabary v. City of Allen*, 547 F. App'x 600, 604 (5th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 664).

[35] *Id.* at 604 (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)).

[36] *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted).

[37] *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

§ 1983 merely provides a remedy for designated rights, rather than creating any substantive rights, "an underlying constitutional or statutory violation is a predicate to liability."[38]   Thus, a plaintiff must identify both the constitutional violation and the responsible person acting under color of state law.[39]   "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"[40]

In this case, plaintiffs invoke § 1983 to seek redress for alleged unconstitutional conditions of confinement in the TPCJC resulting from defendants' alleged failure to implement and enforce protocol, sanitation, and medical policies to protect inmates from the spread of COVID-19 virus in accordance with CDC and WHO recommendations during the pandemic.   In addition, plaintiff Young has asserted a claim of retaliation in response to his spearheading the filing of this lawsuit.

### A.    Conditions of Confinement

The Eighth Amendment's prohibition on "cruel and unusual punishments" applies to both convicted and pretrial inmates through the Fourteenth Amendment's Due Process Clause and forbids conditions of confinement "which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society' . . . or which 'involve the unnecessary and wanton infliction of pain.'"[41]   The constitutional rights of a pretrial detainee encompass both the procedural and substantive due process guarantees of the Fourteenth Amendment.[42]   "The

---

[38] *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (citation omitted).

[39] *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156 (1978).

[40] *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *Thibodeaux v. Bordelon*, 740 F.2d 329, 333 (5th Cir. 1984).

[41] *Estelle v. Gamble*, 429 U.S. 97, 102-103 (1976) (citations omitted); *Farmer v. Brennan*, 511 U.S. 825, 832, 837 (1994).

[42] *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999).

Fourteenth Amendment requires that state officials not disregard the 'basic human needs' of pretrial detainees, including medical care."[43]   Thus, "the substantive limits on state action set by the Due Process Clause provide that the state cannot punish a pretrial detainee."[44]   Pretrial detainees may bring these constitutional challenges as an attack on a "condition of confinement" or as an "episodic act or omission."[45]   An inmates "challenge to a condition of confinement is a challenge to 'general conditions, practices, rules, or restrictions of pretrial confinement'" like those complained of in this case.[46]

"A true jail condition case starts with the assumption that the State intended to cause the pretrial detainee's alleged constitutional deprivation."[47]   Any "punishment" of a pretrial detainee posed by conditions of their confinement, therefore, will run afoul of the Constitution.[48]   "A State's imposition of a rule or restriction during pretrial confinement manifests an avowed intent to subject a pretrial detainee to that rule or restriction," and "even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices."[49]

Thus, to recover for conditions resulting from policies intentionally, whether actual or presumed, creating unconstitutional conditions, the plaintiff must allege that the conditions complained of were the result of a prison official's act either "implement[ing] a rule or restriction

---

[43]  *Reed v. Krajca (Estate of Henson)*, 440 F. App'x 341, 343 (5th Cir. 2011).
[44]  *Reed*, 795 F.3d at 462 (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).
[45]  *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009); *see also Reed v. Wichita Cnty. (Estate of Henson)*, 795 F.3d 456, 464 (5th Cir. 2015) ("[T]here is no rule barring a plaintiff from pleading both alternative theories[.]").
[46]  *Reed*, 795 F.3d at 463 (quoting *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644 (5th Cir. 1996)).
[47]  *Hare*, 74 F.3d at 644-45.
[48]  *Duvall v. Dallas Cty., Tex.*, 631 F.3d 203, 206 (5th Cir. 2011).
[49]  *Hare*, 74 F.3d at 644; *Reed*, 795 F.3d at 463.

or otherwise demonstrat[ing] the existence of an identifiable intended condition or practice" or that the "official's acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice."[50]   Though not expressly, "[t]he Fifth Circuit has at least suggested that condition-of-confinement claims are cognizable against individual actors only in their official capacities."[51]

During the COVID-19 pandemic, courts have remained mindful that "[a] detention facility's protocols for isolating individuals, controlling the movement of its staff and detainees, and providing medical care are part and parcel of the conditions in which the facility maintains custody over detainees."[52]   "[T]the incidence of diseases or infections, standing alone, [cannot] imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks."[53]   "Rather, a detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights."[54]   This requires a showing that either "serious injury and death [a]re the inevitable results of the [institution's] gross inattention to the needs of inmates with chronic illness,"[55] or that a specific rule or policy "caused . . . extreme suffering or resulted in adverse medical outcomes serious enough to establish a constitutional violation."[56]

---

[50] *Hare*, 74 F.3d at 645.
[51] *Nagle v. Gusman*, No. 12-1910, 2016 WL 768588, at *5 (E.D. La. Feb. 26, 2016) (collecting cases).
[52] *Sacal-Micha v. Longoria*, 449 F. Supp. 3d 656, 663 (S.D. Tex. 2020).
[53] *Shepherd*, 591 F.3d at 454.
[54] *Id*.
[55] *Id*.
[56] *Cadena v. El Paso County*, 946 F.3d 717, 728 (5th Cir. 2020).

### 1. **Claims Against Parish President Dove**

Parish President Gordon Dove was named as a defendant in his role as president of TPCG. Plaintiff Mitchell testified that he did not know who Dove was or why he was named as a defendant. Plaintiffs Young, Bonvillain, and Dominique stated that Dove was named because the TPCG owns the jail building. Plaintiffs allege that President Dove was not sued for any particular action on his part but because as parish president, he "forgot" about the inmates when implementing parish policies during the pandemic. Although not asserted in the complaint or at the *Spears* hearing, Young for the first time contends in his opposition to Dove's motion to dismiss that President Dove and TPCG hold the contract with the health care providers in the jail and failed to mandate protocols through the jail's medical department. ECF No. 194.

Nevertheless, plaintiffs have not and could not identify any individual act or policy by Dove with respect to the COVID-19 protocol within the jail and conceded that they had not spoken with Dove about the jail protocol or the pandemic. Instead, plaintiffs generally suggest liability because, as president of the local governing body and owner of the jail building, Dove should have included the needs of the inmates in parish policies and/or assured that the jail and medical staff adopted policies to protect inmates from the virus.

In Louisiana, the Parish government has *no* authority over the general management of the jail or its medical care provider.[57] Instead, under Louisiana law, the Parish government, hence President Dove, is only responsible for the financing and physical maintenance of the jail building[58] and appointing or contracting with a health care provider to tend to the medical needs

---

[57] *Jones v. St. Tammany Par. Jail*, 4 F. Supp. 2d 606, 613 (E.D. La. 1998).

[58] *See* LA. REV. STAT. ANN. § 15:304 ("All expenses incurred in the different parishes of the state or in the city of New Orleans by . . . confinement . . . of persons accused or convicted of crimes . . . shall be paid by the respective

of the inmates.[59]   With regard to the medical care provider, the Parish government's "sole responsibility shall be . . . its contractual obligations with [the] health care provider," and *not* how the medical care is administered.[60]

The Sheriff has day-to-day administrative and operational responsibilities[61] over the jail and the Sheriff is responsible for the inmates.[62]   "Sheriffs in Louisiana are final policy makers with respect to management of the jail . . . [This] policy-making authority over management of the jail is not the result of a delegation from the Parish or any other local government entity," but rather, the Louisiana Constitution itself.[63]

Thus, for purposes of conditions of a jail run by the Sheriff, "[s]imply put, local governments can never be liable under Section 1983 for the acts of those whom the local government has no authority to control."[64]   For these reasons, plaintiffs have no legal basis to assert a claim against President Dove individually or as a policy-maker for the prison.   President Dove simply had no responsibility for the policies and pandemic protocols within the TPCJC.

---

parishes in which the offense charged may have been committed or by the city of New Orleans, as the case may be."); LA. REV. STAT. ANN. § 15:702 ("The governing authority of each parish shall be responsible for the physical maintenance of all parish jails and prisons."); LA. REV. STAT. ANN. § 33:4715 ("The police jury of each parish shall provide . . . a good and sufficient jail . . .")

[59] *Id.*, § 15:703.

[60] *Id.*, § 15:703(D); *accord Belcher v. Lopinto*, No. 18-7368, 2020 WL 5891583, at 5 (E.D. La. Oct. 5, 2020) (Under Louisiana law, a parish government is not policy maker for the prison and had no duty to monitor or verify the performance of medical services it contracted with for the jail).

[61] *See* LA. REV. STAT. ANN. § 13:5539(C) (formerly LA. REV. STAT. ANN. § 33:1435(A)) ("Each sheriff shall be keeper of the public jail of his parish . . ."); LA. REV. STAT. ANN. § 15:704 ("Each sheriff shall be the keeper of the public jail of his parish . . .")

[62] *See, e.g.*, *Fairley v. Stalder*, 294 F. App'x 805, 812 (5th Cir. 2008)(distinguishing the division of duties and responsibilities for local jails between sheriff and local governing body, specifically addressing Orleans Parish Prison and the City of New Orleans); *Broussard v. Foti*, No. 00-2318, 2001 WL 258055 (E.D. La. Mar.14, 2001) (same).

[63] *Jones*, 4 F. Supp. 2d at 613 (citing LA. CONST. ART. 5 § 27).   Plaintiffs' claims against the sheriff's employees are addressed later in this report.

[64] *Cousin v. St. Tammany Parish Jail*, No., 2015 WL 5017113, at 3 (E.D. La. Aug. 19, 2015) (citing *McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir. 1996), *cert. denied*, 520 U.S. 781 (1997)).

Plaintiffs have failed to present a basis for his liability under § 1983 arising from the TPCJC policies and conditions during the pandemic.

Plaintiffs' claims against President Dove are frivolous and otherwise fail to state a claim for which relief can be granted under § 1983. Therefore, all claims against President Dove should be dismissed pursuant to 28 U.S.C. § 1915, § 1915A and 42 U.S.C. § 1997e.

### 2.  Claims Against Defendants Ledet, Bergeron, and Dupre

As repeated in the complaint and *Spears* hearing testimony, plaintiffs named defendants Warden Ledet, former Warden Bergeron, and Captain Dupre, in their respective supervisory roles, because they *negligently* denied and ignored inmates' grievance complaints challenging the lack of Covid-19 protocols within TPCJC and failed to adopt or enforce adequate protocols or policies in accord with the CDC- and WHO-recommendations to assure the safety and health of the inmates during the pandemic. For the reasons that follow, these claims are legally frivolous and otherwise fail to state a claim for which relief can be granted.

The law is well-settled that *negligence* is insufficient to state a claim under § 1983. "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference . . . ."[65] Also, a prison official's involvement in the administrative grievance process is not itself a basis for liability under § 1983. A prisoner "does not have a federally protected liberty interest in having . . . grievances resolved to his satisfaction."[66]

---

[65] *Alton v. Texas A&M University*, 168 F.3d 196, 201 (5th Cir. 1999).
[66] *Schwarzer v. Wainwright*, 810 F. App'x 358, 360 (5th Cir. 2020).

However, a supervisory prison official may be liable for the conditions of the jail if the supervisor "implement[s] a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation."[67]   A plaintiff can prove supervisory liability, without regard for intent, by showing that each named supervisory official implemented an unconstitutional policy that directly resulted in injury to the plaintiff.[68] In this case, for the following reasons, defendants' alleged failure to implement policies satisfactory to the plaintiffs or in compliance with the recommendations of CDC and WHO is not unconstitutional.

The Fifth Circuit recently addressed substantially similar claims by prisoners in Texas in *Valentine v. Collier.*[69]   In that case, medically-compromised inmates at a Texas prison filed a § 1983 action alleging that prison officials' failure to implement adequate protections against the transmission of COVID-19 constituted cruel and unusual punishment in violation of Eighth and Fourteenth Amendments.[70]   Just as the plaintiffs in this case, those inmates complained that the prison officials did not implement or enforce policies to address, *inter alia*, social distancing, mask provisions, mask policy violations, regular cleaning of surfaces, and provision of hand sanitizer.[71]

In addressing the merits of the conditions of confinement claim, the Fifth Circuit acknowledged the district court's findings of these and a number of other matters were not done or could have been done better and more expeditiously by the prison administration to prevent the

---

[67] *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987).
[68] *Id.* at 303-04; *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011).
[69]  978 F.3d 154 (5th Cir. 2020).
[70] *Id.*
[71] *Id.* at 164.

virus spread.[72]   However, in reversing the district court's grant of injunctive relief, the Fifth

Circuit held that the "Eighth Amendment does not enact the CDC guidelines" and that a prison's

failure to comply with CDC guidelines "does not clearly evince a wanton disregard for any serious

medical needs."[73]   Rather, the constitution requires the district court to look at the "affirmative

steps" and evolving policy updates by the prison officials to contain the virus, such as increased

cleaning of common areas, providing inmates and staff with masks, testing of inmates when

necessary, and providing inmates with cleaning supplies.[74]   The court concluded that, although

the defendants' efforts were unsuccessful in preventing spread of the virus, the measures were not

unconstitutional.[75]   In doing so, the court held:

> As a matter of policy, [defendants] could have done more to protect vulnerable
> inmates in the Pack Unit.   But federal judges are not policymakers.   "The
> Constitution charges federal judges with deciding cases and controversies, not with
> running state prisons."   *Lewis v. Casey*, 518 U.S. 343, 363 (1996) (Thomas, J.,
> concurring).   [Defendants'] measures may have been unsuccessful.   But they
> were not unconstitutional.[76]

The court also recognized that "[t]he Eighth Amendment does not mandate perfect [or successful]

implementation" of prison policy.[77]   The ultimate resolve for a court must be that "prison officials

who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause."[78]

In this case, plaintiffs have not alleged that the defendants have adopted or failed to adopt

any COVID-19 protocol policies in an effort to punish them or cause them to become ill.   The

inmates each acknowledged no perceived intent to cause them to contract COVID-19.   Instead,

---

[72] *Id* at 163-64.
[73] *Id*. at 164.
[74] *Id*.
[75] *Id*. at 165.
[76] *Id*.
[77] *Id*. (citing *Petzold v. Rostollan*, 946 F.3d 242, 250 (5th Cir. 2019)).
[78] *Id*. (quoting *Farmer*, 511 U.S. at 844).

the assertion is that the defendant-jail-officials have inadequately responded and not taken sufficient steps to prevent COVID-19 in the jail since their arrival in June 2020. However, but for plaintiff Mitchell's remarkable claim that he tested positive and survived a 115°F temperature, no plaintiff has contracted COVID-19. Further, under the policies and practices in place in June 2020, according to plaintiffs, inmates arriving at the jail were checked for temperature by a nurse before entering the jail. Prison guards were provided masks, although some guards did not always properly wear the masks. Inmates likewise were provided with masks. At some point in the Fall of 2020, the prison began virus testing inmates and created separate dormitory areas in the pod to quarantine newly-arriving and infected inmates. No plaintiffs could confirm that they had been, intentionally or otherwise, housed with a known-to-be actively infected inmate. Instead, plaintiffs mentioned only being in the jail with inmates who previously tested positive in the past and placed back in the regular population after recovery.

Plaintiffs also testified that inmates are regularly provided with cleaning supplies during the week and that the "hatch hole" through which items are passed are cleaned at least twice a week. Several of them confirmed that, in recent months, the prison began spraying a disinfectant in the inmate areas. Inmates are provided with towels and bath/hand soap weekly, with limited opportunities for inmates to purchase or borrow additional soap. Upon my questioning, each plaintiff indicated that he had not been denied medical treatment when requested.

Considering the complaint, as expounded by the *Spears* hearing testimony and in view of the Fifth Circuit's pronouncements in *Valentine*, I find that plaintiffs have not stated a non-frivolous claim arising from the conditions of their confinement due to the COVID-19 protocols adopted at the jail. Per plaintiffs' testimony, TPCJC officials have not adopted policies to

intentionally cause them harm nor disregarded the safety or medical needs of the inmates during the pandemic.   Instead, the TPCJC has taken affirmative steps to improve the protocol within the jail to directly address the risk factors for spread of the virus to inmates.

As the Fifth Circuit explained in *Valentine*, the constitution does not require prison officials to adopt the CDC guidelines and implement those guidances to satisfy their duty to provide for inmate safety and care within prisons.[79]   Plaintiffs have outlined the slowly evolving and reasonable, affirmative steps taken by the jail officials to address the virus.   The officials' actions are sufficient to dispel any suggestion of a wanton disregard for inmate safety, serious medical needs, and to address the known risks to the inmates during the COVID-19 pandemic.[80]

While plaintiffs no doubt genuinely fear that their close confinement potentially increases their exposure to COVID-19, this fear is not sufficient to state a claim for relief under § 1983.[81]   Furthermore, under the PLRA, a plaintiff cannot recover compensatory damages "for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act," as defined in 18 U.S.C. § 2246.[82]   Except for Mitchell, plaintiffs have not alleged, at least with any certainty, that they contracted COVID-19 at TPCJC.   Without physical injury, § 1997e(e) precludes recovery of damages for mental and emotional injury.[83]

---

[79] *Id.* at 164.

[80] *Id.*

[81] *See Hamby v. Warden, Estelle Unit*, No. 20-3428, 2020 WL 7081606, at *2 (S.D. Tex. Dec. 3, 2020) (citing *United States v. Koons*, 455 F. Supp. 3d 285, 292 (W.D. La. 2020) ("General concerns about the spread of COVID-19 or the mere fear of contracting an illness in prison are insufficient grounds to establish the extraordinary and compelling reasons necessary to reduce a sentence."); *Van Dyke v. La. Dep't of Corr.*, No. 20-0448, 2020 WL 1869016, at *2 (W.D. La. Apr. 13, 2020) (holding that generalized fears of COVID-19 do not establish a right to release, transfer, or any other form of redress)); *Boyce v. Harris County Jail*, No. 20-2971, 2020 WL 7024665, at *2 (S.D. Tex. Nov. 30, 2020) (same); *Sheppard v. Etiefer*, No. 20-343, 2020 WL 4495298 at *3 (E.D. Tex. Jul. 1, 2020) (same), R&R *adopted*, 2020 WL 4464582, at *1 (E.D. Tex. Aug. 4, 2020).

[82] 42 U.S.C. § 1997e(e).

[83] *Hamby*, 2020 WL 7081606, at *2 (citation omitted) (inmates could not recover damages from temporary exposure to "deplorable conditions" because nausea from the smell of raw sewage was not physical injury).

For the foregoing reasons, plaintiffs have failed to assert a constitutional violation arising from the conditions of their confinement or the actions, inactions, or policies of the defendants at TPCJC in response to COVID-19 within the jail. Plaintiffs' claims are legally frivolous and otherwise fail to state a claim for which relief can be granted under § 1983. The claims should be dismissed pursuant to 28 U.S.C. § 1915, § 1915A and 42 U.S.C. § 1997e.

### 3. State Law Negligence Claims

Plaintiffs make brief, general references to relief sought under state law and, as noted previously, base most of their arguments on the negligence of the defendants, which is a claim based in state tort law. Because I recommend that all federal law claims be dismissed in this matter, the court has discretion either to decline or exercise supplemental jurisdiction over plaintiff's state law claims. 28 U.S.C. § 1367(c)(3). Considering the statutory provisions of 28 U.S.C. § 1367(c) and the balance of the common law factors of judicial economy, convenience, fairness and comity,[84] I recommend that the court decline to exercise supplemental jurisdiction over plaintiffs' state law negligence claims.

### B. Young's Retaliation Claim

In addition to his § 1983 claim, plaintiff Young contends that he has been retaliated against because he filed this lawsuit. Young's amended claim and *Spears* hearing testimony asserts that, while Young was awaiting evacuation by van on or about October 6, 2020, Mr. Billiott slapped a piece of candy from Young's hand stating, "I'm going to destroy you Mr. Lawsuit man." On

---

[84] *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350-51 (1988); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *Heggemeier v. Caldwell Cty., Tex.*, 826 F.3d 861, 872-73 (5th Cir. 2016); *Enochs v. Lampasas Cty.*, 641 F.3d 155, 158-59 (5th Cir. 2011); *Brookshire Bros. Holding v. Dayco Prod., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009); *Batiste v. Island Records, Inc.*, 179 F.3d 217, 227 (5th Cir. 1999).

Young's return to TPCJC on October 12, 2020, Mr. Billiot had him placed in "the hole," or administrative segregation, for disobedience in connection with the earlier incident.

Young also claimed that on October 12, 2020, he also was held down and injured by the strike force after he repeatedly beat on the cell door to get a guard's attention. This incident resulted in injuries for which he refuses to seek medical care at the jail. Young also testified that the task force had no knowledge of this lawsuit, and the incident was unrelated to the incident with Mr. Billiot. He also stated that has not been prevented from filing administrative grievance complaints or any documents with a court.

To state a claim of retaliation, a plaintiff must allege facts showing that a prison official possessed a retaliatory motive and the retaliatory act caused an *actual* constitutional injury to his ability to pursue a non-frivolous legal claim.[85] The Fifth Circuit has explained that "[t]he purpose of allowing inmate retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising their constitutional rights."[86] Thus, "[t]o prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional rights, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation."[87] Causation requires a showing that "but for the retaliatory motive[,] the complained of incident . . . would not have occurred" even if the official's actions under different circumstances may have been legitimate.[88]

---

[85] *Lewis*, 518 U.S. at 349-50.
[86] *Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006) (citing *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998)).
[87] *Morris*, 449 F.3d at 684; *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998).
[88] *Clarke v. Stalder*, 121 F.3d 222, 231 (5th Cir. 1997), *vacated in part & reinstated in relevant part*, 154 F.3d 186 (5th Cir. 1998) (citing *Bounds v. Smith*, 430 U.S. 817 (1977); *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997); *Woods v. Smith*, 60 F.3d 1161, 1164-66 (5th Cir. 1995) (quotations and additional citations omitted); *accord Walker v. Savers*, 658 F. App'x 720, 726-27 (5th Cir. 2016).

The Fifth Circuit also has cautioned that trial courts must carefully scrutinize retaliation claims.[89]  "The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties.  Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions."[90]  The Fifth Circuit provides guidance for the "careful scrutiny" to be used to evaluate retaliation claims:

> To state a claim of retaliation *an inmate must allege the violation of a specific constitutional right* and be prepared to establish that *but for* the retaliatory motive the complained of incident . . . would not have occurred.  This places a significant burden on the inmate . . ..  The inmate must produce *direct evidence of motivation* or, the more probable scenario, "allege a chronology of events from which retaliation may plausibly be inferred."[91]

For these reasons, "mere conclusory allegations of retaliation" or a prisoner's mere belief that an action had retaliatory motive are insufficient to establish retaliation.[92]

Young stated his concerns that Mr. Billiot's reference to him as "Mr. Lawsuit man" was a reference to his role in filing the instant lawsuit.  The law is clear that mere use of verbal slurs and threats by a prison guard do not rise to the level of a constitutional violation.[93]  Further, allegations of threats and harassment by a guard simply do not state colorable civil rights claims and are not actionable under § 1983.[94]  The Fifth Circuit also has consistently rejected *retaliation* claims based solely on a prison's guards use of threatening or derogatory language.[95]

---

[89]  *Woods*, 60 F.3d at 1166.
[90]  *Id.* (citation and quotation omitted).
[91]  *Id.* (citations omitted) (emphasis added); *Walker*, 658 F. App'x at 726-27.
[92]  *Woods*, 60 F.3d at 1166; *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999).
[93]  *McFadden v. Lucas*, 713 F.2d 143 (5th Cir. 1983) ("Mere threatening language and gestures of a custodial officer do not, even if true, amount to a constitutional violation.").
[94]  *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002); *Bender v. Brumley*, 1 F.3d 271, 274 n. 4 (5th Cir. 1993) (noting that verbal abuse is insufficient to serve as the legal basis of a civil rights action.).
[95]  *Gibson v. Jean-Baptiste*, 802 F. App'x 858, 859-60 (5th Cir. 2020).

The law, however, is equally clear that prison officials may not act on threats by retaliating against a prisoner for exercising his constitutional rights, including the First Amendment right of access to the courts or the ability to complain through proper prison channels about alleged misconduct by prison officials.[96]   Here, Young's allegations at least suggest that any retaliation resulted from his role in spearheading the filing of the instant lawsuit, a right protected by the First Amendment right of access to the courts.

To prove a violation of that right, as required by the first element of a retaliation claim, a prisoner must demonstrate that his position as a litigant was *actually* prejudiced in pursuing a legitimate or non-frivolous claim in a court or through the grievance system at the jail.[97]   Without proof of an *actual* violation of a specific constitutional right, there is no actual constitutional injury or prejudice.[98]   Notably, Young stated emphatically that he regularly files grievance complaints and has not been stymied in filing pleadings with the courts.   "Retaliation against a prisoner is actionable *only* if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights."[99]   As Young denies any denial of his right to access the courts or pursue his grievances, even if Mr. Billiot referred to him as "Mr. Lawsuit man," his retaliation claim fails.

Young also contends that he has been generally "targeted" by TPCJC officials for his role in this litigation.   Those allegations are conclusory and include no reference to specific violation

---

[96] *Walker*, 658 F. App'x at 726 (citing *Morris*, 449 F.3d at 684); *Woods*, 60 F.3d at 1164.

[97] *Lewis*, 518 U.S. at 349-50 & 356; *Every v. Jindal*, 413 F. App'x 725, 727 (5th Cir. 2011) (citing *Lewis*, 518 U.S. at 349-50 and *Jones*, 188 F.3d at 325); *Cochran v. Baldwin*, 196 F. App'x 256, 257-58 (5th Cir. 2006) (citing *Lewis*, 518 U.S. at 350-51); *Eason v. Thaler*, 73 F.3d 1322, 1328 (5th Cir. 1996).

[98]   *Morris*, 449 F.3d at 684; *Decker v. McDonald*, No. 09cv27, 2010 WL 1424322, at *15 (E.D. Tex. Jan. 11, 2010), *report & recommendation adopted*, 2010 WL 1424292, at *1 (E.D. Tex. Apr. 7, 2010) (addressing retaliation for using prison grievance system) (citing *Morris*, 449 F.3d at 687, *Jones*, 188 F.3d at 324-25, *Johnson*, 110 F.3d at 310, *Moody v. Baker*, 857 F.2d 256, 258 (5th Cir. 1988), and *Whittington v. Lynaugh*, 842 F.2d 818, 820 (5th Cir. 1988)) (other citations omitted); *accord Walker*, 658 F. App'x at 726-27.

[99]   *Morris*, 449 F.3d at 685-86 (emphasis added).

of a particular constitutional right as a result of the allegedly retaliatory motive by a named defendant.   For example, Young made clear that the October 12, 2020, incident with the strike force was unrelated to the incident with Mr. Billiot.   He further stated that the strike force would not have been aware of his lawsuit.   His allegations, therefore, fail to point to a chronology of events or pervasive retaliatory motive behind the strike force's actions in restraining him after he beat on the door in violation of disciplinary rules.

Young also mentioned that, in October of 2020, after his return from the hurricane evacuation, he was housed for three days in a less than sanitary cell with no drinking water and without being able to shower for eight days while evacuated.   Young was placed in the cell because of his disciplinary violation involving the candy incident discussed earlier.   He does not allege that the conditions were imposed as punishment for the exercise of his constitutional rights for purposes of this retaliation claim.   Absent punitive intent, the conditions of Young's confinement also do not violate his Eighth or Fourteenth Amendment rights.[100]

Moreover, conditions of temporary and short duration rarely rise to the level of a constitutional violation.[101]   Only in extreme circumstances do unsanitary conditions for a short

---

[100]  *Baqer v. St. Tammany Parish Gov't*, No. 20-980-WBV-JCW, 2020 WL 1820040, at *12 (E.D. La. Apr. 11, 2020) (quoting *Chavera v. Allison*, No. 1:08cv256-JMR, 2009 WL 1011157, at *5 (S.D. Miss. Apr. 15, 2009) (citing *Collins v. Ainsworth*, 382 F.3d 529, 540 (5th Cir. 2004); *Crook v. McGee*, No. 2:07cv167-MTP, 2008 WL 53269, at *2 (S.D. Miss. Jan. 2, 2008); *Robertson v. Coahoma Cty.*, No. 2:07CV78-SA-SAA, 2008 WL 3334091, at *5 (N.D. Miss. Aug. 6, 2008)).

[101]  *Davis*, 157 F.3d at 1006 (inmate suffered no "extreme deprivation of any 'minimal civilized measure of life's necessities'" when he was confined in a filthy "management cell" for only three days) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) and citing *Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996) (holding no Eighth Amendment violation when prisoner was exposed for four days to raw sewage from overflowed toilet in his cell)); *Wilson v. Lynaugh*, 878 F.2d 846, 849 & n.5 (5th Cir. 1989) (Inmate who complained of "unsanitary practice[s]," including unsanitary water fountains, toilets leaking water, and unsanitized living quarters, failed to state a claim.); *Desroche v. Strain*, 507 F. Supp. 2d 571, 581 (E.D. La. 2007) ("Courts have repeatedly held 'that the Constitution does not mandate prisons with comfortable surroundings or commodious conditions.'") (quoting *Talib v. Gilley*, 138 F.3d 211, 215 (5th Cir. 1998)); *see also*, *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993) (Unsanitary conditions may rise to the level of a constitutional violation only if they result in "a serious or significant . . . injury resulting from the challenged

duration rise to the level of a constitutional deprivation.    For instance, in *Taylor v. Stevens*,[102] the Fifth Circuit recognized that a prisoner forced to live in two squalid cells for six days articulated an Eighth Amendment claim.    In *Taylor*, the first cell's entire surface—floors, ceilings, windows, walls and water faucet—was covered with massive amounts of feces and emitted a strong fecal odor.[103]    The second cell was extremely cold and had no water fountain, no bunk, and no toilet— only a drain in the floor that was clogged and smelled strongly of ammonia which plaintiff refused to use because it would spill onto the floor where he had to sleep.[104]    After denying facilities (or even a functional drain) within which to urinate, officers refused to escort the plaintiff to the bathroom for a 24-hour period.[105]    On those facts, the Fifth Circuit recognized that the plaintiff stated an Eighth Amendment claim, even with the relatively short 6-day duration.[106]

---

conditions."); *Whitnack v. Douglas Cty.*, 16 F.3d 954, 958 (8th Cir. 1994) (noting the intolerable conditions lasted not more than 24 hours and, therefore, no constitutional violation was found); *Daigre v. Maggio*, 719 F.2d 1310, 1312–13 (5th Cir. 1983) (holding 10-day administrative lockdown that subjected prisoners to "dirty and filthy" mattresses, laundered blankets at most once a week or even up to three weeks, and no soap to wash hands with between using the toilet and eating meals was not sufficient to establish constitutional deprivation where some measure of hygiene was provided by available water and utensils at meals)).

[102] 946 F.3d 211 (5th Cir. 2019), *aff'd in part and vacated on other grounds*, *sub nom.*, *Taylor v. Riojas*, 141 S. Ct. 52 (2020).

[103] *Id.* at 218–19.

[104] *Id.*

[105] In ruling, the Fifth Circuit expressly noted that prison officials are not required "to provide a prisoner with a squeaky-clean toilet nor to escort him to the restroom whenever he wishes."  *Id.* at 225 n.20.    When, however, the plaintiff is refused a restroom for 24 hours and provided no other sanitary means to relieve himself, the situation is similar to circumstances in which the court has previously found violative of the Constitution.  *Id.* (citing *Palmer v. Johnson*, 193 F.3d 346, 353 (5th Cir. 1999)).

[106] *Id.* at 220-21; *see also Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) (prisoners regularly forced to live in cells covered with "crusted fecal matter, urine, dried ejaculate, peeling and chipping paint, and old food particles" established an Eighth Amendment violation); *McCord v. Maggio*, 927 F.2d 844, 848 (5th Cir. 1991) (prisoner forced to sleep on a wet mattress "in filthy water contaminated with human waste" for ten months amounted to a violation of the Eighth Amendment); *Palmer*, 193 F.3d at 353 (finding 49 prisoners forced to spend night on 20' x 30' work field, without being allowed to leave the area to defecate and urinate, in cold weather, without blankets, jackets or shelter stated Eighth Amendment claim); *Burnette v. Bureau of Prisons*, 277 F. App'x 329, 331 (5th Cir. 2007) (holding that prisoner stated an Eighth Amendment claim based on being required to share a garbage bag as toilet with mentally unstable inmate; officers sealed cell door with tape and refused to remove bag, which emitted odor and leaked sewerage in cell); *Harper v. Showers*, 174 F.3d 716, 719–20 (5th Cir. 1999) (reversing dismissal of claim for injunctive relief based on allegations that weekly cell moves, often into cells that are filthy with feces-smeared in them next to psychiatric patients who scream, beat on the metal toilets, short out the power, flood the cells, throw feces and light

Young's allegations of three days in an unsanitary cell with no drinking water and the lack of shower access for eight days[107] do not rise to the level of a constitutional violation or present the extreme conditions like those addressed in *Taylor*. Instead, the temporary conditions of Young's administrative confinement are more akin to the § 1983 claims of temporary conditions regularly rejected by courts in this district[108] and elsewhere.[109] Thus, although the court may sympathize that the conditions were less than comfortable, the temporary conditions did not rise to the level of a constitutional violation and do not support Young's retaliation claim.

---

fires as such conduct, depending on the facts, may qualify as deprivations of life's basic needs in violation of the Eighth Amendment); *Little v. Keirsey*, 69 F.3d 536, at *1, *5 (5th Cir. 1995) (holding that plaintiff stated claim for inhumane confinement when he alleged that, for 18 days, he was confined to a cell where the floor was constantly covered in water, urine and excrement from an overflowing toilet in this cell, lack of windows and ventilation caused stench, which inhibited him from eating and made him vomit, his shoes were soaked from the foul mixture, and he developed a body rash from the extreme heat).

[106] The Constitution does not require inmates have daily or even weekly showers. *See Hamilton v. Lyons*, 74 F.3d 99, 106 n.8 (5th Cir. 1996) (holding denial of visitation, telephone, recreation, mail, legal materials, sheets, and showers for a three-day period do not constitute cruel and unusual punishment); *see also Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012) ("[L]imiting inmates to weekly showers does not violate the Eighth Amendment."); *Shakka v. Smith*, 71 F.3d 162, 167–68 (4th Cir. 1995) (holding no Eighth Amendment injury when prisoner was given water and cleaning supplies but denied a shower for three days after having human excrement thrown on him).

[107] The Constitution does not require inmates have daily or even weekly showers. *See Hamilton v. Lyons*, 74 F.3d 99, 106 n.8 (5th Cir. 1996) (holding denial of visitation, telephone, recreation, mail, legal materials, sheets, and showers for a three-day period do not constitute cruel and unusual punishment); *see also Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012) ("[L]imiting inmates to weekly showers does not violate the Eighth Amendment."); *Shakka v. Smith*, 71 F.3d 162, 167–68 (4th Cir. 1995) (holding no Eighth Amendment injury when prisoner was given water and cleaning supplies but denied a shower for three days after having human excrement thrown on him).

[108] *See, e.g.*, *Magee v. Crowe*, No. 09-3142, 2010 WL 630011, at *8–9 (E.D. La. Feb. 19, 2010) (stating that a "short-term sanitation . . . problem, although admittedly unpleasant, does not amount to a constitutional violation" and holding that placement in isolation cell for 21 days with a hole in the floor for a toilet, which could only be flushed from outside and was flushed only once or twice a day, which backed up into the cell while prisoner was sleeping, and in which prisoner could only shower twice in those 21 days, did not constitute an extreme deprivation).

[109] *See, e.g.*, *Crowley v. Austin*, No. 18-431, 2018 WL 3381494, at *3 (W.D. La. May 29, 2018) (holding that 3 days in holding cell without bed, running water or toilet not sufficient to rise to the level of constitutional violation); *Duvall v. Burns*, No. 6:15cv564, 2016 WL 7664308, at *1, *5–7 (E.D. Tex. Oct. 24, 2016) (ruling that a weekend in cell where he could not take a shower or flush the toilet, but was supplied drinking water with meals, failed to satisfy the objective component for an Eighth Amendment violation); *Eady v. Head*, No. 04-0648, 2006 WL 2663776 (W.D. Tex. Sept. 15, 2006) (holding two days without shower and exposure to the foul smell of a backed-up shower did not show deliberate indifference to the plaintiff's basic human needs).

Without a constitutional injury or violation of a constitutional right, Young's allegations are insufficient to support a retaliation claim against Mr. Billiot or any named defendant.[110]   His retaliation claim should be dismissed as frivolous and otherwise for failure to state a claim for which relief can be granted pursuant 28 U.S.C. §§ 1915, 1915A and 42 U.S.C. § 1997e.

### C.    Pending Motions

#### 1.    Plaintiffs' Motion for Preliminary Injunction (ECF No. 29)

As identified above, among the critical elements necessary to grant a preliminary injunction are proof of the substantial likelihood of success on the merits.[111]   For the foregoing reasons, plaintiffs have failed to allege a non-frivolous claim to proceed past screening in this action. Plaintiffs have not "clearly carried the burden of persuasion" necessary to warrant relief.[112]   In light of my recommendation that the claims be dismissed as frivolous and otherwise for failure to state a claim, there is no substantial likelihood of success and the motion should be denied.[113]

#### 2.    Defendant Dove's Motions to Dismiss (ECF Nos. 134, 242)

As outlined previously, defendant Dove filed two motions under FED. R. CIV. P. 12(b)(6) to dismiss with prejudice the claims asserted by plaintiffs Young and Dominique for failure to state a claim for which relief can be granted.   ECF Nos. 134, 242.   In light of the Court's recommendation that the complaint be dismissed pursuant to its statutory frivolousness review, there are no claims remaining against Dove or the other defendants.   Dove's motions should be dismissed as moot.

---

[110]   *Morris*, 449 F.3d at 687; *Jones*, 188 F.3d at 324-25; *Johnson*, 110 F.3d at 310; *Moody*, 857 F.2d at 258.
[111]   *eBay Inc.*, 547 U.S. at 391.
[112]   *Planned Parenthood of Houston & Se. Tex.*, 403 F.3d at 329.
[113]   *Brown v. Orleans Parish Sheriff's Office*, No. 19-12432, 2019 WL 5633884, at *1 (E.D. La. Oct. 31, 2019) (plaintiff's claims were frivolous, so preliminary injunction was denied for lack of legal basis).

## RECOMMENDATION

For the foregoing reasons, it is **RECOMMENDED** that the 42 U.S.C. § 1983 claims filed by plaintiffs John Cornelius Young, III, John Fitzgerald Bonvillain, Jr., Barry Mitchell, and Tory Dominique be **DISMISSED WITH PREJUDICE** as frivolous and otherwise for failure to state a claim for which relief can be granted pursuant 28 U.S.C. §§ 1915, 1915A and 42 U.S.C. § 1997e, and plaintiffs' state law negligence claims be **DISMISSED WITHOUT PREJUDICE** because the court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c).

It is further **RECOMMENDED** that plaintiffs' **Motion for Preliminary Injunction (ECF No. 29)** be **DENIED**.

It is further **RECOMMENDED** that defendant Parish President Gordon Dove's **Motions to Dismiss (ECF Nos. 134, 242)** be **DISMISSED AS MOOT.**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.[114]

New Orleans, Louisiana, this ___15th___ day of January, 2021.

DONNA PHILLIPS CURRAULT
UNITED STATES MAGISTRATE JUDGE

---

[114]*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*) (citing 28 U.S.C. § 636(b)(1)). *Douglass* referred to the previously applicable ten-day period for filing of objections, which was extended to fourteen days by amendment effective December 1, 2009, 28 U.S.C. § 636(b)(1).

41